0180 O'Quinn v. City of Houston and will you Mr. Ahmad? I am Judge. May it please the courts. This case is an employment discrimination and retaliation case and it's a very good example, almost a perfect example, of how Rule 56 has been increasingly misapplied by the district courts in which the district courts have been requiring plaintiffs and holding plaintiffs to a burden that is far beyond what Rule 56 requires to get to a jury. And what happened here is my clients Mr. O'Quinn and Mr. Bennett, they were working at a fire station and they observed a hangman's noose at the station. A sign and everybody agrees, City of Houston, Texas. They reported it immediately after they reported it. They had assignments cut, overtime opportunities cut, and it's extremely important for a firefighter to have that additional pay. These firefighters at this time, they were earning around $45,000 to $50,000 per year for doing what they were doing. And so what many of them do is they supplement that income by doing extra things, working community events, teaching certification classes, things of that sort. And for doing that they get additional pay in the form of overtime. And when the City of Houston moved for summary judgment against the plaintiffs they really misrepresented the evidence and then the district court sort of And so here's where specifically the district court erred. What the City of Houston argues with respect to O'Quinn is that he didn't provide the level of detail they claim was necessary to support his claim for lost assignments. And they make that claim to the district court in the record at 163 and in the brief at 19 to 20. But that's not true. What O'Quinn testified to is that his assignments immediately after the reporting of the noose incident were cut from approximately 20 down to 3 to 5. And what happened was immediately after they reported the noose, Mr. O'Quinn found that he was given the assignments, the Now he was willing to do them, but because he was only given the assignments that nobody else wanted, his assignments were cut and his pay was dropped accordingly. Is he the one who was taking people to the Fireman's Museum? Yes. Okay. And did he get extra pay for that? He did. He did. But after the reporting of the noose, that's all the extra assignments he received. And so Mr. O'Quinn testified the number of assignments decreased from 20 to around 3 to 5 and then gave a calculation that that cost him approximately $20,000 over the following year. And so certainly enough detail that would allow Mr. O'Quinn to get to a jury proving his case for the adverse actions taken against him. Is your theory that those overtime hours went to somebody else or just that they disappeared? They went to somebody else. And Mr. O'Quinn knew that because he saw on the assignment board, he could see all of the extra assignments and who was getting them. And he testified to that fact as well. And so they were taken from him and they were then given to other folks. And what's your evidence that that's retaliatory? Is it mainly just a temporal proximity or do you have anything beyond that? Yes. I mean, in this one, because it was literally within a matter of days, yes, we're relying on temporal proximity. And Mr. O'Quinn testified to that in his deposition. And like I said, gave the calculation that cost him approximately $23,000 in overtime pay, which he used, which he would have used to supplement his income. With respect to Mr. Bennett, Mr. Bennett, and so we think when the district court held and the city of Houston argued that Mr. O'Quinn did not provide the level of detail, we think that was error. With respect to Mr. Bennett, what Mr. Bennett testified to is that immediately after reporting the news, his overtime assignments were cut entirely. And what Mr. Bennett did to earn supplemental pay was he taught certification classes on Saturdays. And there were approximately two per month that he taught regularly over an extended period of time. Then immediately after he reported the news incident, those assignments were cut. And Judge Ho, there is a little bit of extra evidence with respect to the captain, testified that after they reported the news incident, she claimed to have some issues with Mr. Bennett and Mr. O'Quinn with respect to punctuality. Couldn't really give details about it, but acknowledged that those types of details would have caused her to cut the assignments. And so with respect to Mr. Bennett, he testified that his classes were cut. And this is particularly egregious what the city did. When they moved for summary judgment, they claimed they misrepresented what the adverse actions were. They claimed that it was simply a Form 42 notation, which is effectively a negative mark in Mr. Bennett's file. Someone accused Mr. Bennett of planning the noose and somebody had told Mr. Bennett that he was now, they were supposed to watch him closely. Now those actions, we are not suing for independent damages for those actions, but they certainly give evidence of the intent of discrimination and retaliation. But what the city didn't acknowledge was that Mr. Bennett's classification classes were cut. And when you look at the record, where the city of Houston filed their motion for summary judgment and attached their evidence, and this is going to be at 221 to 222, which is the portion of Mr. Bennett's deposition, they cut the one portion of testimony where he talked about the classes that he was cut. And so when we responded to the summary judgment, we put that in the record, and so that would be at 357 is where that language appears that was omitted from the city of Houston. And what Mr. Bennett testified to is that he couldn't, and there were two forms of extra assignments that Mr. Bennett did. There were the events, like Mr. O'Quinn did, but there are also the teaching the classes. And Mr. Bennett testified, I can't remember the events, I can't remember, you know, off the top of my head right now, but I do recall specifically the classes that were taken from me. And so he did provide the level of detail, or at least offer to. The city of Houston, tellingly, never followed up, didn't ask him about that. And he wanted to. Mr. Bennett said, you know, yeah, I can tell you about the classes and the depositions. Like, no, no, let's let's talk about the other things. And so in the other discover responses, Mr. Bennett stated that there were two classes per month, and in the economic damages that he incurred for that, and that would be in the record at 643. And so when the district court held that Mr. O'Quinn did not provide the level of detail necessary to get to a jury, we think that is clearly erroneous. What is required is for you to show enough that you have enough evidence of an adverse action to support a genuine issue for the jury. And so when the when the district court held that that level of and increasingly done over time by the district courts, we think that it's sort of morphing Rule 56 into, instead of requiring to show a genuine issue of material fact, that they're really asking the plaintiffs to effectively prove their case at the motion for summary judgment stage. And that is just not what is required. Well, I assume I assume you argued all this to the district court, right? That is correct, Judge. So you're saying she misread the record or just had too narrow a view of things? I actually, with respect to the the assignments, I think she misread the record. Because when you look at where the district court cited to the deposition testimony, it seemed like first she said, well he can't can't remember the events, but then when it came to the classes, she said he couldn't remember those either. And that's not true with respect to the deposition testimony that's in the record at 357. He states specifically, I can't remember the events, but I do remember the classes I was scheduled to teach that I was told you can't do this now. The record at 185 for immediately after they reported the noose incident. And so, and then the district court also stated that Mr. Bennett could not remember the details of of the classes. That's not in the record. And Mr. Bennett was not even asked about that in his deposition. And in the in the discovery that we provided to the district court at 643 in the record, Mr. Bennett stated that it was approximately two per month and then those were cut. And so we think that that is the level of detail necessary to get to a jury. And Mr. O'Quinn and Mr. Bennett deserve their day in court. They, after this occurred, they filed their charge with the EEOC and then to assert their rights under Title VII, came to the federal court, you know, paid their $400, $450 filing fee, paid for the service, paid for depositions to be taken. They deserve their day in court. And with respect to the hostile work environment and the discrimination, we view this primarily as a retaliation case, but there certainly is enough evidence in the record to support the hostile work environment claim and the discrimination claim. But the, and by the way, the statement by the captain admitting to cutting the assignments is in the record at 438. And so we think that this case clearly belongs before a jury that can view the evidence and weigh the explanations for why this was done. And so unless the court has any other time, I'd like to reserve my time for rebuttal. Thank you. Mr. Higgison. May it please the court. I'm Robert Higgison for the city of Houston. And Judge Gilmour did not misread the record. In fact, she covered it very thoroughly in her order and she came to the conclusion that neither Mr. O'Quinn nor Mr. Bennett made a prima facie case for discrimination or for retaliation and that they didn't have any evidence of a hostile work environment. Something that has, that's important has been a little bit skipped over here is the way Mr. O'Quinn and Mr. Bennett reported seeing this news. First of all, it wasn't in a fire station where they were ordinarily working. They work in the Public Affairs Division and then they were at an event at Fire Station 41. And so as Mr. O'Quinn was walking... Where is Fire Station 41? Wow, Your Honor, I just really don't know where Fire Station 41 is. I'm sorry. I just wondered what part of the city it was in. I don't even know. I guess this is a problem of too narrow a focus on my part and I apologize for that. Sometimes it's like here it is, this is what matters, but honestly that's a good question. I wish I knew this, but there was a... So as Mr. O'Quinn was walking to the captain's office after the event was over, he passed by, as you know it because you've read this, he passed by an open locker that had a noose in it. And so he understood that to be an offensive, racially insensitive at best, offensive symbol. And at least sometimes and often it's taken that way. And so that no one else would see it, he stood in front of it until everybody was gone. And so they do claim that that in itself is enough for a hostile work environment. Of course other cases really hold that a single incident is not enough. It was isolated and not pervasive. There are even other cases involving nooses that have far more surrounding racial animosity type of conduct that hold that it was not enough for a hostile work environment. And then it goes to the retaliation for the report of the noose. Which got into the local TV news, I gather. Oh it did, and I remember this somewhat from ten... I don't. Ten years ago. I remember something about it vaguely. I wasn't working at the city then. I might remember it more clearly if I had been, but I remember it's something about being in the local news. Yes it was. But that wasn't what, that wasn't, they don't claim to have been the people who informed the news stations. That's not a part of this case. Okay. At least, yes, it's not a part of the case. But the report, there's a chain of command, of course, in a fire department like there is in a police department. They're kind of in some way quasi-military in their structure. I mean we don't think of fire departments as being military, but they do have a chain of command that's very important that they follow it and keep it, keep it enforced and disciplined so that they can be efficient in their operation. And you know, if there is a call, when there is a call, because there are many calls, when there is a call that the orders flow the right way and that people go and respect that chain of command and go up to it if there is something that they need to convey upward. And in this instance, Mr. O'Quinn asked his friend Mr. Bennett, who then asked another friend, Mr. Parker, Kenyatta Parker, and they said, look, let's take this on up to Assistant Chief Rick Flanagan, because we know him. Now, I have to tell you, talking to somebody who you have a personal relationship with has great appeal to me. I like the idea that I could skip over some levels in the chain of command. But I don't work in a structured environment like that, and if I did, I would have to follow it just like they have this chain of command. They skipped over two levels to get up to Assistant Chief Rick Flanagan. They should have gone to Captain Beta Kent, who is an immediate supervisor, or Captain Ponce Lopez, who is also an immediate supervisor for each of the two men. Above those two captains was Assistant Chief Homero Longoria, and they skipped over him, too, to get up to Assistant Chief Rick Flanagan, who is one level below the fire chief, who at that time was Phil Beresky. Now, is that a question? I'm sorry. No. Okay. Sorry. Just a breath, I think. And so, when they had this meeting, the Form 42 is a document that contains kind of a record of what a firefighter does during his career. It has various meetings. It might have a disciplinary... I think we know the fact. I mean, you know, they had the Form 42, and then it suggested something unfavorable, but then they exit out, and so on. Well, exactly. And so, this was what Mr. Bennett thought was the retaliation, but then it just disappeared. And so, there isn't any retaliation. And then both Mr. Bennett and Mr. O'Quinn were getting favorable reviews, and then Mr. Both of them passed the captain's exam. Mr. O'Quinn got promoted to captain. There was no adverse action against him or against Mr. Bennett. Mr. Bennett would have been promoted to captain, except for the fact that there were others ahead of him. And so, neither one of them is able to make a prima facie showing of a case for discrimination or retaliation. Over what period of time are they saying that they were disadvantaged in overtime and the entire limitation, you know, two or three years of limitations, or what? I don't get that from the record. I get that it was a relatively short period of some time during that year. Well, they didn't file the complaints until about six months after the noose incident. Well, right. And then it sat with the EEOC for five and a half years. Right. And so, but there was no indication that there was anything else going on during that five and a half years. I just wondered, Mr. O'Quinn says that Mr. I'm sorry, Ahmed says Mr. O'Quinn estimated he had lost about $20,000 a year. Well, and that was in his deposition, and I don't believe there are any documents to back that up. Of course, even if that is a material issue, they don't have the adverse action because neither one of the two men showed any comparators. They didn't say that here's so-and-so who's getting this more than me. Even though one of them says, yes, I think I know who got this, they didn't come forward with that evidence at this stage. Well, I thought I just heard, though, that those hours went to other people. But they didn't say... Presumably other people who didn't complain. Pardon me for interrupting. No, that's all right. They didn't say who that was. They didn't have any evidence that there were other comparators. To have a comparator, you've got to be specific and point out who it is. You know, this person who's different from me in this way. And so... Well, why is it enough... Pardon if I'm missing something. Why is it enough for them to say, I made a complaint about an extremely offensive racial act. All I know is, all of a sudden, my overtime hours went away. And it wasn't because they weren't necessary. You give it to the field. It was distributed amongst everybody else who didn't complain. Are you saying that's not enough? I am saying that that's not enough, but also because they would need to say... Well, why not? Because just making a conclusory statement that some other people got it isn't any evidence to show that those hours still continue to be available and were given to somebody else, and that it was because of a complaint about... because of a protected activity. And remember, we have to go back to... Well, I get your point. If your point is there's no causal connection, that's a separate point. I take their argument to be that this happened essentially right after they complained. Well, I think that's... I think our cases say proximity... I'll review our cases again, but I think time might be enough to get to a jury. Am I mistaken about that? I think it's not too long. I think the timing might be within a close enough period for that. But, again, we have to go back to what may have triggered that anyway, which was the discipline, if you want to call it that, skipping over two levels of chain of command. Okay, so that's a different argument. There you're saying they weren't retaliated against because of a complaint that's protected. Exactly. You said they were retaliated against because of breach of the chain of command. Yes, if you want to call it retaliation... Why is that not a jury issue? Exactly. I was just going to say, but if you want to call that retaliation, it would be more proper to say this is a discipline. You know, don't do this. We've got to get... I didn't mean to rig it. You called it discipline for a chain of command as opposed to retaliation versus retaliation for preventive activity. Exactly. If that's your point, why is that not a jury issue? Well, because they didn't... It's just speculation that it was done for this other reason. They didn't have the comparators. I thought you acknowledged... Okay, so the time is enough. I think you've conceded... I don't mean to put words in your mouth, but I think you said the close proximity is enough to imply a potential connection. I might be mistaken about that, Your Honor, and I apologize for not having the time right here in my mind. My goodness, this is two things that this panel has already... I mean, one more strike. Judge Holden, please don't ask me a question I don't know the answer to. But I'm not certain of that timing. My sense is that it was soon enough, but it's not about reporting the news. It's about the breaking of the chain of command. So it's a disciplinary thing. And then later, later, the chief, the actual chief, Debriski, I'll get it right, came in and agreed, well, look, it was all right for you to do that. And so a later ratification of that or excuse of that doesn't undo... I mean, it doesn't go relate back in time and say, well, we couldn't really uphold this chain of command. We have to have the chain of command. And so there's nothing that they brought forward to say that the chain of command really shouldn't have been enforced. Because this discipline, the disciplinary action, if you want to call this an adverse action, the disciplinary action happened before Chief Beriski came along and said, well, it was all right for you to go to Flanagan for this. And so this isn't retaliation. It's, if anything, it's discipline. But we also... I don't think anybody's saying that you're not allowed to enforce the chain of command. I think the question is, is that why the overtime hours were removed? Or is it because of an impermissible retaliation? And to me, that sounds like a jury question. Except that they don't have any comparators to show... They couldn't have. How could the fire department have arbitrarily removed overtime hours without documenting it and going through some sort of civil service type discipline process, right? Well, the firefighters are not entitled to those. They're discretionary with their superiors. Really? Yes. And so they can make those decisions, their management decisions. It's similar to the employment cases from this court and the U.S. Supreme Court where you have this principle that courts cannot be super personnel departments and micromanage these things. I was just asking the procedural question because I just assumed this was overlaid with all sorts of due process concerns, but you're saying not. Well, because there's not a property right to that, and so it's not a due process issue. Where I was going with the other quote was not to suggest that this court was going to try to be a super personnel department, but the rest of that principle is that those decisions are business type decisions that are left to the employer. And so this isn't taking away something that they're entitled to. This is just making a decision about, okay, what are we doing here? How many of these do we have? What need do we have? And who's most appropriate for it? All right. Now, when you say that to bring an overtime claim like this, you have to have comparators and so on. What's your best case for that? Oh, I think that we'd have to look at Felton or Burlington. These are really talking about how, describing what ultimate decisions, ultimate employment decisions are, the hiring and granting leave, discharging, promoting, and compensating. It's Felton. This case is, this court's case, 315 F. 3rd, 476, 2002 case. And that's really, it's explaining what things rise to the level of adverse action. And here they haven't really established that the terms and conditions of their employment were diminished. And as I already mentioned, they kept getting positive reviews. You don't have a right to overtime on the job. Right. But if it is accurate that Mr. O'Quinn said he was making up to $20,000 a year in overtime, I mean, is that likely, that the fireman would make 50% above the scheduled salary because of overtime and outside activities? I think that's possible. Where does that money come from? Does that come from the fire department budget, or does it come from the people to whom the certification things are given? I believe it's from the fire budget. Interesting. If the court wants, I can supplement with an answer to that question. No, I'm just exploring it. To go back to this comparative point, because I think that's, if I discern you correctly, that's really your main point. I take their point to be, we used to be at X number of overtime hours, this bad thing happened, and now all of a sudden they're at something sub-X. Is your point they had to affirmatively show that other people were kept the same? Yes. Whereas here we're just sort of assuming that? Yes, they would have to affirmatively show, here's so-and-so who's different from me in this way, and they're getting it and I'm not getting it. I'm being treated less favorably than that person, and they didn't do that. I'm going to ask what may be an unfair question because it may not be in the record, but are you aware that everybody else was also docked overtime? In other words, there was less need for overtime, or is it a mystery? It is not in the record. It is a mystery, Judge Howe. But I believe that Judge Gilmour correctly read the facts in the record and correctly applied the law, granted summary judgment, and I'll just leave it there if you don't have any other questions. Okay. Thank you, sir. Thank you. Mr. Ahmad? Thank you, Judge. Judge Howe, you were on the right track. Comparators are not needed on a timing case, and that's under Clark County. They're not needed, or you've provided sufficient evidence of it? No, they are not needed. When you have this close of timing and the assignments are cut, you don't need to. Oh, I see. You're saying under our precedence temporal proximity is an alternative measure or alternative form of proof to a competitor theory. Exactly. When the timing is very close under Clark County and then Evans v. City of Houston, that in and of itself is enough to raise an issue on causal connection. And so with respect to the assignments, again, Mr. O'Quinn testified that the assignments did go to other folks because he could see the board. And again, going back to my initial point, we're getting into the difference between what's enough to get to a jury versus what we have to prove our case to a jury. And so, yeah, we might bring other evidence at trial, but we're not required to at the summary judgment stage. Don't we have cases that say that, generally speaking, lost overtime opportunities are not an adverse employment action? I don't believe so, Judge. I think under the Burlington case, it is what would dissuade someone from filing a complaint like this. And when you have somebody who makes 50 percent of their pay in other assignments and those are cut, that would certainly rise to that level. If the people in Fire Station 41, do they have the same kind of compensation procedure where they depend heavily on overtime and special events? Yes. I mean, that's across the board at the fire department. And, frankly, their schedules are set up because there are a lot of firefighters around Houston and you can only afford to pay them so much. And so they have their schedules arranged that allows them to have the flexibility to do those other things to supplement their income. And so, yes, if you're going to take away 50 percent of their income, that would certainly constitute an action that would dissuade somebody from filing a complaint. And so with respect to Mr. Bennett, and I believe it's in the record at 357 where he talks about the classes, he was a little unclear about what happened to those classes, admittedly. But from our perspective, we think that the classes certainly continue because you can't just do away with them. But even if that occurred and the reason was because he complained, that would be retaliation unless they could come in and offer some legitimate non-retaliatory reason. For example, we had to cut them from the budget or something. They've not offered that and we don't think that's because we don't think that occurred. And just a final point. The council spent a little bit of time talking about, I guess, attacking the plaintiff's evidence about protected activity. Judge Gilmour, she got that right. I mean, all you have to do, you don't have to strictly follow a chain of command when you are opposing illegal discrimination. And so they reported it, they made it known to the campus. Let me ask you, did anything ever happen to whoever had placed the noose in their locker? Our understanding is no. There was no discipline taken. I mean, I assume someone, it was pretty readily discoverable, whose locker was involved, right? It was. So they knew, and it was a captain's locker. They knew who it was, which captain, and there was no discipline taken for having that noose. And there is a picture of the noose in the record. I don't have the site off the top of my head, but it is in the record. And so they properly opposed harassment in the workplace, clearly engaged in protected activity. And then just the final point is, you know, the city of Houston, their whole approach, and to some extent the district court's approach has been just looking at it only one-sided from the plaintiff's perspective. Well, that's not how you look at it under Rule 56. I mean, it's the defendant's burden to come forward and show that there is no evidence on an essential element, and they have not done that. Well, actually, it's your burden on Rule 56 to show that there's a genuine issue of material fact. They don't have to say anything to file their motion, but you have to say there's a genuine issue. Well, that's correct. But when they do that, if that is the approach, if they're not going to try to disprove our case, well, we can come and offer the type of evidence that we did, and that should be enough to get to a jury. So I thank you very much. All right, sir. Thank you. We'll be in recess until 9 o'clock tomorrow morning.